## UNITED STATES v. CENTER VEAL & BEEF CO. et al.

Nos. 274–276, Docket 20622–20624.

Circuit Court of Appeals, Second Circuit.

July 25, 1947.

See also, D.C., 61 F.Supp. 72.

George Trosk and Kaufman, Gallop, Climenko, Gould & Lynton, all of New York City, for appellants Frank J. Murray Co., Inc., Center Veal & Beef Co., Inc., and Siegfried Hermann.

Joseph C. Kenney, of New York City (Jesse Climenko and Joseph C. Kenney, both of New York City, of counsel), for appellant Albert Merlis.

Frederick H. Block and John F. X. McGohey, U. S. Atty., both of New York City, (Bruno Schachner, of New York City, Asst. U. S. Atty., of counsel), for the United States.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The defendants, Hermann and Merlis and their companies, were charged with buying false ration cheques, with fraudulently obtaining subsidies from the Defense Supplies Corporation, and with conspiracy to commit both these crimes. The charge against them for buying forged ration cheques was in seventy-six counts, each count for a separate cheque (we shall speak of it as the "Information"); the charge for fraudulently obtaining subsidies was in twenty-five counts, each count for a separate payment (we shall speak of it as the "Subsidy Indictment"). Judge Picard submitted all the counts in the three accusations to the jury, except counts 9, 12, 13, 14 and 15 of the "Subsidy Indictment," and the jury brought in a verdict of guilty on all counts submitted. The judge dismissed counts sixteen to twenty-five, inclusive, of the "Subsidy Indictment." He then sentenced Merlis and Hermann to five years on each count of the "Subsidy Indictment," the sentences to run concurrently; and to $5000 fine on each count cumulatively. The only corporate defendant in the "Subsidy Indictment" was the Frank J. Murray Co., Inc., and he sentenced it to a fine of $5000 on each count. Under the "Information" he sentenced Merlis and Hermann to one year's imprisonment on each of the seventy-six counts—the sentence to run concurrently with the sentence on the two indictments—and he fined them $1000 each on the first fifty counts; and he fined each corporation $1000 on each of the first fifty counts. Under the conspiracy indictment he sentenced Merlis and Hermann to two years' imprisonment—the sentence to run concurrently with the other sentences; he fined each $5000; and he fined each corporation $5000. The result was that Merlis and Hermann have been sentenced to imprisonment for five years, and each to a fine of $105,000; the Frank J. Murray Co., Inc., has been fined $105,000, and the Center Veal & Beef Co., $55,000. Upon this appeal the appellants depend chiefly upon the insufficiency of the evidence; but they also complain of the conduct of the trial by the judge and the prosecutor; and that the conspiracy indictment was invalid, the object of the conspiracy having been in part ac-

complished. We proceed first to state the evidence and to discuss the inferences which the jury was justified in making from it.

██ The Center Company was a wholesale meat seller which bought most, though not all its meat from the Murray Company, a butcher which bought cattle direct from the breeders. Both were corporations, and Hermann and Merlis owned all the shares of each, half and half (Hermann had assigned his interest in the Center Company to his wife; but it is not necessary to say that a jury would be justified in finding that this was a mere fetch to conceal his continued interest). He was president of the Murray Company, and Merlis was president of the Center Company. The two companies had a single New York office, but the Murray Company's butchery was at Chester, New York; it did not appear that Merlis ever went to Chester, but Hermann was at times at the New York office. Beginning in June, 1943, the Murray Company began to file with the Defense Supplies Corporation applications for subsidies, which the regulations allowed to butchers to cover the "spread" between what they had to pay to the unregulated breeders, and the "ceilings"which limited the prices they might charge to wholesalers or retailers. Each of these petitions had alleged that the Murray Company had filed with the O.P.A. a statement of the number of pounds of meat it had butchered, the number of points it had received from wholesalers; and that the statement had been accompanied by ration cheques of the Murray Company, to the order of the O.P.A. upon its ration point account in its own bank. Until April, 1944, all these petitions were false, because the Murray Company had never filed any such statements with O.P.A. and had not of course filed any ration cheques with them.

It does not appear how or why the O.P.A. learned that the Murray Company had been getting subsidies in this way; but it did learn so at least as early as April, 1944, and it demanded an accounting. The Murray Company then filed cheques drawn on its account for the deficiency up to date, together with a statement covering all past transactions. Since its point account in the bank was not large enough at the time to meet the necessary drafts, it built it up by cheques of the Center Company drawn on the Center Company's point account in another bank for past purchases from the Murray Company. On the other hand, as the Center Company's own account was not itself large enough to cover these drafts, that company built it up by the deposit of forged ration cheques, purporting to be drawn by meat dealers upon a New Jersey bank. These the Center Company procured as follows. They were in blank—without payees—and the company bought them from one, Tapen, a wholesale meat dealer, who had them from Bertola, a painter, who forged the makers' names upon blank cheques, which he got from the bank's teller, Hahn. As the cheques were presented at the bank, Hahn abstracted them before they were charged against the supposed makers' accounts—out of the four names used only one was fictitious. Thus the Center Company got a credit in its point account when the clearing house —Federal Reserve Bank—credited the cheques to its account in its own bank, and Hahn's bank never apparently discovered that any charge had been made against it. How the charge, which must have appeared in the clearing house accounts, was concealed from Hahn's bank does not appear; but it makes no difference, for concededly the scheme was for a time successful. The Center Company continued to buy these cheques until the autumn of 1944, when the fraud was discovered; but not until it had bought cheques for about twelve million points, which—since the only testimony is that the price was one dollar a thousand—a jury might conclude had cost $12,000.

The guilt of the Murray Company upon those counts of the "Subsidy Indictment" which covered petitions filed before the Center Company began to pay ration cheques, is too clear for debate. Only someone in authority could conceivably have had any motive so to fill the company's treasury: moreover, it is incredible that the practice should have gone on for so long as it did without, not only the connivance, but the active direction, of Hermann. The fact that his signature to the petitions was not proved—if it was not—is irrelevant; if he was not the guilty person,

a jury would have had to assume that some subordinate, who could not profit a penny, vicariously continued throughout the period to filch money from the United States and pour it into Hermann's and Merlis' pockets. Picard, J., left to the jury all the counts of the "Subsidy Indictment" (except, as we have said, numbers 9, 12, 13, 14, 15) upon the theory that, even after the Center Company had begun to pay ration cheques, if the cheques delivered to the O.P.A. were based upon the forged cheques deposited by the Center Company, the statements were fraudulent. Later Picard, J., out of what was perhaps an excessive caution, dismissed counts 16 to 25 inclusive, leaving only those ten counts charging petitions filed during the period when no statements and no cheques whatever were filed with the O.P.A. On these ten counts the sentences against Hermann and the Murray Company are impregnable.

The only question as to the "Information" is whether Merlis knew that the cheques were forged, —if so, he and the Center Company were guilty on all counts. That he could not have supposed that he was engaged in lawful transactions is apparent from their very nature, although there was corroboratory evidence. Such cheques could not be the subject of lawful sale; their only permissible use was in the purchase of meat and the jury was justified in imputing to Merlis knowledge of this basic condition of the business. The only even plausible argument is that, although he may have known that the cheques were in some way illicit, nothing proved that he knew them to have been forged. This can easily be shown to be without foundation; for there were only three possibilities: the cheques might have been bought from the makers; they might have been stolen; they might have been forged. The first we can rule out at once; no wholesaler or retailer, even if fraudulently disposed, would be likely to sell points, which were absolutely necessary to his own accounts. Moreover, if he did, he would not sell them to a confederate at such a price that the confederate could get his share of the loot by selling them at one dollar a thousand. Again, it was impossible that they should have been stolen from the makers; for they were in blank and yet they were for a given number of points. That meant that, although the wholesaler or retailer had drawn them to cover some specific purchase, he had left the seller's name blank. That Tapen or his unknown confederate should be able— before the makers delivered them to the sellers—to steal a series of such cheques which were not prepared in advance of the transactions, is fantastic. If stolen, they must have stolen from the sellers, and even though we were to assume that it was customary to pay in cheques which had no payee, it would be highly unreasonable to suppose that the sellers, finding their cheques stolen, would not at once have stopped payment at the bank on which they were drawn; or, if they did not know what the bank was, would not have notified the buyers. For these reasons the guilt of Merlis and the Center Company upon the "Information" was as clearly proved as that of the Murray Company and Hermann on the "Subsidy Indictment."

There remains only the conspiracy indictment, our discussion of which will also dispose of Hermann's and the Murray Company's guilt under the "Information" and Merlis's guilt under the "Subsidy Indictment." It was an irrefragable inference that each man must have known what the other was doing. Each was an equal owner in both companies, together they were the only owners. While it is true that the Center Company did not get all its meat from the Murray Company, it got by far the greater part; and, conversely, while the Murray Company did sell meat to others than the Center Company, it sold by far the greater part to that company; to all intents the men were doing a single business as butchers and wholesalers. The butchering part of the business had been going on for months by a series of frauds; and when these were eventually discovered, and it became necessary to cover them, the selling part of the business stepped in with a complementary series of frauds by which the first series could be, and for a time in fact were, concealed. Yet we are asked to say that this seamless web was woven in part by one hand and for the rest by another

and that one hand did not know what the other was doing. We are to say that a jury had to conclude that although Hermann carried on his raids upon the Treasury for the equal benefit of Merlis and himself, he did not communicate them to Merlis; and that, although when Hermann's crucial need arose for points which he knew Merlis had not supplied, Merlis did not tell him that the points by which he was making up for his past illegal purchases were based upon credits in his bank fabricated by forged cheques. Even if the two men had been dealing at arms length, this obvious concert of action to extract them from past illegal transactions would have been enough to charge them; but, as we have seen, they were not dealing at arms length, but had always been joint and equal owners. Any jury which had allowed itself to be fobbed off with the blind that each man had not been privy to what the other was doing, would have been made up of simpletons or knaves. No doubt, at the outset the purchase of forged cheques was not contemplated; the two men may have supposed that their frauds would never be discovered; perhaps they trusted to their ingenuity to devise an escape, if they were. The time when they first decided to purchase the forged cheques, is not of any consequence; it did not divide the conspiracy into two parts; the means which confederates adopt to disentangle themselves from the consequences of their earlier offences, are part of their enterprise; avoiding detection is implicit in every conspiracy

■■ The next point is that the convict-tion for conspiracy must fail under the doctrine which we accepted in United States v. Zeuli,[1] which is that, where the object of the conspiracy is a crime to which the conspirators are the only parties and which they have consummated, they may not be indicted for a conspiracy to commit it. The indictment charged Hahn, Bertola and Tapen, as well as Merlis and Hermann, with a conspiracy to commit a number of offenses, among them that of buying forged ration cheques. The argument is that, when Merlis bought and Hahn, Bertola and Tap-

en sold the cheques, it was no longer possible to indict them for conspiracy to commit it; and that it does not appear that the sale was not the only offense which the jury found that the defendants did conspire to commit. This reasoning misconceives the doctrine. It does not mean that whenever conspirators have consummated the crime which they have planned, they can no longer be convicted of conspiracy. That might have been a good doctrine, but it is not the law.[2] What it does mean is that, when thewhen the crime, which is the object of the putative conspiracy, requires for its commission some reciprocal action of the conspirators indicted, they may not be indicted for conspiring to commit it if they have in fact consummated it. This is because the crime presupposed their mutual agreement which was therefore a part of it. We may assume that, if Tapen had been indicted with Merlis for conspiracy to sell the forged cheques, the indictment would not have stood; but the conspiracy charged, although Tapen was said to have been a party to it, was not so limited. It charged two crimes: the purchase of the cheques and the filing of the petitions; and to neither of these crimes were Merlis and Hermann necessary parties. Merlis did not buy the cheques of Hermann; Hermann did not file the petitions with Merlis.

■■ The now almost inevitable challenge of the fairness of the prosecution's summing up has little foundation. Part of it appears to rest on the theory that if the inferences are untenable which a prosecutor asks a jury to make, the verdict cannot stand: a strange conception. Provided the prosecutor confines himself to the evidence and makes an argument which he believes to be valid, it would be an utterly impossible standard to require the judge to check its cogency; and it would be the clearest invasion of the jury's function. It is true that in his peroration the prosecutor in the case at bar seems in substance to have asked the jury, if they had doubts about the defendants' guilt, to consider the effect upon the public of a verdict of not guilty. That he plainly should not have

---

[1] 2 Cir., 137 F.2d 845.

[2] Heike v. United States, 227 U.S. 131, 144, 33 S.Ct. 226, 57 L.Ed. 450; United States v. Uram, 2 Cir., 148 F.2d 187.

done; but upon objection by the defendants the judge corrected it as follows: "I will eliminate \* \* \* the statement \* \* \* about broadcasting to the American people in the event of another emergency." We think it incredible that with this caution the remark, ill advised as it was, could have left any effect upon the jury. As to the prosecutor's allusion—it was nothing more —to Romanoff's testimony before the grand jury, it was plainly a slip, for he had just before told the jury to "strike \* \* \* out any reference to Romanoff." Nobody objected to it at the trial; plainly it is now brought forward as an afterthought.

■ The chief complaint of the charge is that the judge did not read or explain to the jury that regulation which required the petitions to be supported by statements made to the O.P.A. and by ration cheques; and that other regulation which forbade the purchase of forged ration cheques. It is true that the Third Circuit in three decisions,[3] has held, where the crime was selling above the ceiling price, that it is necessary to explain the regulations to the jury, and that the judge's failure to do so vitiates the conviction, even though the defendant did not ask him to do so. Moreover, there is language in the books to the effect that the jury must always be told to "apply the law to the facts," and that it is not enough merely to tell them what issues of fact determine guilt. In Morris v. United States,[4] there is an elaborate collection of these expressions It is of course true that a jury has the power to acquit the accused, though they may believe that he is guilty; and that this is an inherent element in the system. Nevertheless, since admittedly it is their duty to accept the law as the judge gives it to them, we cannot understand what distinction there is, except one of mere form, between telling them what issues determine guilt, and what legal propositions they should apply to the evidence. The only conceivable difference, so far as we can see, is that the second method may be thought to give them a larger ap-

parent latitude for disregarding the law and substituting their own notions of justice. We are extremely sceptical that it has even that it has even that effect; and we are not at the moment ready to assume that the encouragement of such a disposition is essential to the preservation of our liberties.

Be that as it may, the present appeal does not require us to decide the point, and, arguendo, we will assume that it was necessary for the judge to leave the case to the jury in the form of those general propositions of law which they were to apply. He begun his charge with the "Subsidy Indictment" and read to them the statute,[5] which makes it a crime to present any false claim against the United States. He then took up the "Information" which was for a violation of an extremely long and prolix statute, giving power to the President to ration scarce goods in time of war,[6] one subdivision of which (No. 5), makes it a crime not to obey orders issued in pursuance of the authority so conferred. He suggested that it was not necessary to read this statute, and the defendants expressly assented. He then read one count of the "Information" which incorporated in ipsissimis verbis § 2.5 of Article II of Ration Order No. 8. He then recurred to the "Subsidy Indictment," and told the jury that it charged the defendants with making a fraudulent statement that the Murray Company had filed "the report required \* \* \* under Ration Order No. 16." That order is a very long one in twenty-four articles occupying over twenty pages of agate print in the Federal Register, and laying out with the greatest conceivable particularity the whole system of rationing meat, fats, fish and cheeses. He did not then go into any details; but after his colloquial charge, while dealing with the prosecution's requests, he said of Ration Order No. 16 that it "required the deposit with the office of Price Administration of certified checks of slaughterers based on credits legitimately acquired by the deposit of legitimate meat ration checks." That was an entirely ac-

---

3 United States v. Levy, 3 Cir., 153 F. 2d 995; United States v. Noble, 3 Cir., 155 F.2d 315; United States v. Pincourt, 3 Cir., 159 F.2d 917.

4 9 Cir., 156 F.2d 525.
5 Title 18, U.S.C.A. § 80.
6 Title 50 U.S.C.A. War Appendix, § 633.

curate synopsis of the regulation, so far as it went; all it omitted was that part of the regulation which required the filing of statements which the cheques were to accompany, and nobody suggested that the omission was material. We will not upset a conviction for such an omission, or require a judge to befuddle a jury by reading pages of verbiage, which for its comprehension needs hours of study. If this is part of trial by jury, the Supreme Court must declare it; we cannot see that as yet any court has gone so far.

The only other point that requires discussion is the judge's refusal to grant the defendants' fifteenth request to charge which in substance was that, if Hermann had in good faith filed the subsidy petitions on the advice of counsel, he was guiltless. The judge gave as his reason that there was no evidence that Hermann had acted on any legal advice, in which we may for argument assume that he was wrong. However, he had just charged the jury at length that the mere signing of the cheques was not a crime; that the person who signed them— Hermann—must have known them to be untrue and have signed them to accomplish some unlawful end; and that intent was always crucial. "Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion."[7] Having so unequivocally told them that they must find that Hermann was engaged in what he knew was unlawful transaction, it would have been bringing coals to Newcastle to add that he was not guilty if he acted in good faith upon his lawyer's advice.

There are other objections, but they are trivial, and we shall not discuss them. The accused had a fair trial; their guilt was manifest; their offense struck at the nation's protection in its hour of peril; if punishment is ever justified, the sentences they received were just. Their sordid contribution toward breaking down the collective effort to conserve our national resources, was morally removed only a step from giving aid and comfort to the enemies of their country.

Convictions affirmed.

[7] United States v. Bayer, 330 U.S. —, 67 S.Ct. 1394.