**UNITED STATES of America,**
**Appellee,**

v.

**Richard BECKER and Jack Eisen,**
**Appellants.**

No. 636, Docket 72–1105.

United States Court of Appeals,
Second Circuit.

Argued May 2, 1972.

Decided May 30, 1972.

Herald Price Fahringer, Buffalo, N. Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., of counsel), for appellants.

Patrick F. Broderick, Sp. Atty., U.S. Dept. of Justice (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., John W. Nields, Jr., Asst. U. S. Atty., David J. Ritchie, Patrick Philbin, Sp. Attys., U. S. Dept. of Justice, of counsel), for appellee.

Before KAUFMAN, MANSFIELD and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

On June 30, 1971, seven persons were charged in a two-count indictment with conducting an illegal gambling business in violation of 18 U.S.C. § 1955, which

had been enacted as part of the Organized Crime Control Act of 1970, and conspiracy to do so, 18 U.S.C. § 371. Five defendants pleaded guilty to the conspiracy count.[1] The remaining two, Richard Becker and Jack Eisen, appellants herein, were on January 14, 1972, adjudged guilty of both counts after a jury trial before Judge Weinfeld in the United States District Court for the Southern District of New York. Each was sentenced to two years imprisonment (of which 18 months was suspended, subject to the standing probation order of the court) and to pay a fine of $5,000. We affirm the judgments of conviction.

Title 18 U.S.C. § 1955 makes it a federal crime to conduct certain types of gambling businesses. To fall within the ambit of the statute, the gambling business must be one which

"(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."

18 U.S.C. § 1955(b) (1).

■ Appellants concede for purposes of this appeal that they were operating a bookmaking business. Thus the proof satisfied parts (i) and (iii) of the definition. They contend, however, that the Government failed to meet the requirement of subsection (b) (1) (ii) of the statute that there be at least five persons who "conduct" the illegal gambling business,[2] since at least four of their co-conspirators were mere "runners" or "agents" of the business. We disagree.

Admittedly the limits of the term "conduct," which embraces participation in the operation of an enterprise, are not defined in § 1955 itself. However, the legislative history of another, simultaneously-enacted section of the Organized Crime Control Act of 1970, 18 U.S.C. § 1511, sheds light on the intended meaning of the term. Section 1511, which prohibits conspiracy to obstruct the enforcement of the criminal laws of a state or one of its political subdivisions with the intent to facilitate an "illegal gambling business," defines the latter term in identical word-for-word terms as § 1955. With respect to the definition the authors of the bill stated

"The term 'conducts' refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet." H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. & Admin.News p. 4029.

Thus Congress' intent was to include all those who participate in the *operation* of a gambling business, regardless how minor their roles and whether or not they be labelled agents, runners, independent contractors or the like, and to exclude only customers of the business.

■ Since §§ 1511 and 1955 were enacted together as Parts B and C (§§ 802–803) of Title VIII of the Organized Crime Control Act of 1970, P.L. 91–452, 84 Stat. 936–37 (1970), they should be construed *in pari materia*. The foregoing legislative history of the word "conduct" as used in § 1511 is therefore of compelling persuasiveness in defining the meaning of the same term as used in § 1955. See 2 Sutherland, Statutory Construction § 5202 (1943). In view of the broad construction of "conduct" by Congress, we find no difficulty in con-

---

1. The substantive charges against them were dismissed with the Government's consent.

2. The Government makes no contention that any of these runners "finance, manage, supervise, direct, or own all or part of [the gambling] business." 18 U.S.C. § 1955(b) (1) (ii).

cluding that "runners" or "agents" of a bookmaker fall within this category and that the requirement that the business be conducted by a minimum of five (5) persons has been satisfied.

Appellants next argue that § 1955 is unconstitutional because it does not require proof of a specific effect on interstate commerce flowing from the gambling prohibited. This argument is foreclosed by the Supreme Court's recent opinion in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), which upheld the constitutionality of a federal statute prohibiting loan sharking, 18 U.S.C. § 891 et seq., against a similar challenge, after concluding on the basis of Congressional findings that the prohibitied activities affected commerce between the states and justified exercise of federal power under the Commerce Clause. Justice Douglas, speaking for the Court, noted that

> "loan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and the rich alike and syphons funds from numerous localities to finance its national operations." 402 U.S. at 157, 91 S.Ct. at 1363.

The statement applies with equal force to illegal gambling of the class prohibited by § 1955. Indeed the President's Commission on Law Enforcement and Administration of Justice has concluded that "gambling is the greatest source of revenue for organized crime." Operating through a system of "layoff" bets "accomplished through a network of local, regional, and national layoff men" throughout the nation, the profit flowing into criminal coffers from gambling activities, the Commission concluded, may approximate $6 to $7 billion each year. President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 188–89 (1967); Id., Task Force Report: Organized Crime 2–3 (1967). In considering the gambling provisions of the Organized Crime Control Act, members of Congress relied upon these findings and figures. See 116 Cong.Rec. 590–91, 603 (1970)[3] (Remarks of Senators McClellan and Allott). Senator McClellan in particular was concerned about the magnitude of the profits made by bookmakers, which he had discovered during the course of Congressional hearings on gambling. 116 Cong.Rec. 590 (1970).

We therefore conclude that Congress acted well within the bounds of the Commerce Clause in enacting § 1955. The statute reaches only "a class of activities . . . properly regulated by Congress without proof that the particular intrastate activity against which a

---

3. See also 116 Cong.Rec. 604 (1970) (Remarks of Senator Allott):

"In addition to being largely the creature of organized crime and its principal source of revenue, illegal gambling both involves and affects interstate commerce. People, information, funds and paraphernalia, without which gambling enterprises could not be conducted, move regularly across State lines. Moreover, by diverting expenditures from ordinary lines of commerce into its own coffer, gambling distorts the production of goods for commerce and the flow of goods in interstate commerce. These interstate aspects of gambling make it an appropriate subject of concern to the Federal Government.

"There are numerous cases in the Federal courts that demonstrate the dependency of substantial gambling enterprises on the facilities of interstate commerce.

\*    \*    \*    \*    \*

"Moreover, information available to the Government has disclosed that a system of couriers has been used to deliver funds which have been 'skimmed' from Las Vegas casinos to points throughout the country. Profits from gambling are not only transported in interstate commerce but are also being funneled out of the country as well. Government agents are attempting to breach the wall of silence thrown up by foreign bankers to cover the millions of dollars of untaxed underworld money which is allegedly flowing to numbered accounts in banks in Switzerland."

sanction was laid down had an effect on commerce." *Perez, supra,* at 152, 91 S. Ct. at 1361.[4] See United States v. Ruisi, 460 F.2d 153 (2d Cir. 1972). All courts thus far passing upon the constitutionality of § 1955 have reached the same conclusion.[5]

■ Appellants next argue that because the alleged substantive offense required the participation of five or more persons, a conspiracy count based upon the same illegal conduct was improper, under the doctrine that "Where concert is necessary to an offense, conspiracy does not lie." United States v. Sager, 49 F.2d 725, 727 (2d Cir. 1931). United States v. Center Veal & Beef Co., 162 F.2d 766, 770 (2d Cir. 1947); United States v. Zeuli, 137 F.2d 845, 846 (2d Cir. 1943). The answer is that in this case an additional two persons, or seven in all, were named in the indictment as having engaged in the conspiracy, whereas the substantive offense required the participation of only five. It is a fundamental principle, too settled to require explication, that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961). As we have recently reiterated, as long as the conspiratorial concert of action and the substantive offense underlying it are not coterminous and fewer participants are required for the commission of the substantive offense than are named as joining in a conspiracy to commit it, there is no infirmity in the conspiracy indictment. United States v. Benter, 457 F.2d 1174, 1178 (2d Cir. 1972). Appellants do not suggest that the evidence was insuf-

ficient to support a verdict finding them guilty of participation in a seven-man conspiracy. Indeed all seven defendants stand convicted of the conspiracy charge. Upon the record before us, therefore, appellants' conviction of the conspiracy charge appears to be valid and must be affirmed.

Appellants next urge, for the first time on this appeal, that their convictions should be reversed on the ground that certain incriminating telephonic interceptions introduced by the Government against them at trial, which had been obtained as the result of two eavesdropping orders issued by the district court pursuant to the Omnibus Crime Control and Safe Streets Act ("the Act"), should be suppressed because of the Government's failure to comply with provisions of the Act specifying the procedure to be followed in authorizing an application to a court of competent jurisdiction for such orders. One provision is 18 U.S.C. § 2516(1), which provides in pertinent part that "The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, . . . ." The other relevant sections are §§ 2518(1) (a) and 2518(4) (d), which require that the application to the court and the court order name the officer authorizing the application.

After appellants' counsel learned for the first time during the pendency of

---

4. Although in light of our finding that § 1955 is constitutional it becomes unnecessary for us to consider the magnitude of the particular activity here charged, *Perez, supra* at 154, 91 S.Ct. 1357 it appears from the testimony below that this was no penny ante operation. From records of the bookmaking business seized by federal agents, the Government's expert was able to conclude, without contradiction by the defense, that appellants'

operation grossed approximately $100,000 per weekday and $150,000 on weekends and employed at least 30 "runners" to collect bets and make payoffs.

5. See Schneider v. United States, 459 F.2d 540 (8th Cir. 1972) and cases there collected at n. 2; United States v. Iannelli, 339 F.Supp. 171, 180 (W.D.Pa. 1972).

their appeal of certain disclosures made by the Government with respect to procedures followed by it in seeking interception orders in other cases, notably United States v. Robinson, 40 U.S.L.W. 2454 (5th Cir. 1972); United States v. Baldassari, et al., 338 F.Supp. 904 (M.D. Pa.1972); and United States v. Cihal, 336 F.Supp. 261 (W.D.Pa.1972), appellants suggested to us that letters authorizing applications to the district court for two interception orders in this case, one dated May 4, 1971 and the other May 12, 1971, which bore the purported signature of Assistant Attorney General Will Wilson, had not in fact been signed by him but had been signed by a deputy who affixed Wilson's name to the letters.

With respect to the May 4, 1971 wiretap order, it is undisputed that the application for the order was personally authorized by the then Attorney General of the United States, John N. Mitchell. On May 3, 1971, he initialed a memorandum to Will Wilson, Assistant Attorney General, specially designating Mr. Wilson pursuant to § 2516 to authorize Milton J. Carp, Attorney in Charge of the Organized Crime and Racketeering Section of the Department of Justice, to apply to the district court for an order permitting the interception of wire communications on two Yonkers telephones. Thereupon Henry E. Petersen, Deputy Assistant Attorney General in Charge of the Criminal Division, acting with Wilson's prior authority, signed Wilson's name to a letter authorizing Carp to apply to the court.

■■ We are satisfied that the Government, by thus obtaining the personal authorization of Attorney General Mitchell, complied with the requirements of the Act in seeking the May 4, 1971 order. Although the application to the court erroneously stated that it had been authorized by Wilson rather than by the Attorney General himself, we consider this to be harmless error. United States v. Consiglio, 342 F.Supp. 556 (Crim. No. H–24) (D.Conn. filed April 20, 1972).

In any event the resultant interception did not yield any evidence used against appellants at trial.

■ Turning to the May 12, 1971, wiretap order authorizing the interception of wire communications on two Hartsdale telephone numbers, which were received in evidence against appellants, the facts as related in affidavits of officials of the Department of Justice appear to be identical with those recently furnished to another panel of this court in United States v. Pisacano, 459 F.2d 259 (2d Cir. 1972), petition for cert. filed April 28, 1972, 40 U.S.L.W. 3528. According to the affidavit of Sol Lindenbaum, Executive Assistant to Attorney General Mitchell, neither the Attorney General nor an Assistant Attorney General had personal knowledge of the proposed application for the order or personally signed an authorization to apply to the court for it. Mr. Lindenbaum, in accordance with prior instructions from the Attorney General to review all requests for such authorization, reviewed a recommendation that the application be made and because the Attorney General was unavailable he affixed Mitchell's initials to a memorandum of authorization to Assistant Attorney General Will Wilson. Thereupon Harold P. Shapiro, Deputy Assistant Attorney General in the Criminal Division, signed Wilson's name to a letter authorizing Carp to apply to the court.

Upon the foregoing facts the panel in *Pisacano* concluded that although the procedure used by the Attorney General and his staff in authorizing the application to be made for one wiretap order (dated July 30, 1970) did not follow the literal reading of § 2516(1), *supra*, the Attorney General's delegation of authority to Mr. Lindenbaum rather than to an Assistant Attorney General would not warrant reversal of a conviction obtained through use of wiretaps resulting from the court order thereby obtained. We feel bound to follow *Pisacano*, especially since it is so recent and the facts before the court there are indistinguish-

able.[6] See, e. g., Tellier v. Commissioner of Internal Revenue, 342 F.2d 690, 692 n. 3 (2d Cir. 1965), affd., 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966); Mallory v. United States, 104 U.S.App.D.C. 71, 259 F.2d 801, 802 (1958); see generally A. Alexander, En Banc Hearings in the Federal Courts of Appeal: Accommodating Institutional Responsibilities, 40 N.Y.U.L.Rev. 562, 582 n. 120 (1965). Our adherence to the law of the circuit, as thus established, is not to be construed as an approval of the procedure followed by the Attorney General and his staff and we trust that henceforth all applications to the court pursuant to §§ 2516 and 2518 will be specifically authorized personally by the Attorney General or by an Assistant Attorney General specifically designated by him for the purpose.

We have considered the other points raised by appellants and find them to be without merit.

The judgments of conviction are affirmed.

6. The following courts have suppressed wiretap evidence obtained under circumstances substantially similar to those surrounding the Government's application for the May 12, 1971 order in the present case. United States v. Robinson, —— F.2d —— (5th Cir. 1972); United States v. Cihal, 336 F.Supp. 261 (W.D. Pa.1972), appeal docketed, No. 72-1201 (3d Cir. April 13, 1972); United States v. Baldassari, 338 F.Supp. 904 (M.D. Pa.1972); United States v. Aquino, 338 F.Supp. 1080 (E.D.Mich.1972); United States v. Focarile, 340 F.Supp. 1033 (D. Md.1972); United Staets v. Casale, 341 F.Supp. 374 (M.D.Pa.1972).