**UNITED STATES of America,**
**Plaintiff,**

v.

**Orlando VIGI et al., Defendants.**
**Crim. A. No. 46922.**

United States District Court,
E. D. Michigan, S. D.

Aug. 24, 1973.

See also D.C., 350 F.Supp. 1008.

Geoffrey A. Anderson, U. S. Dept. of Justice, Detroit, Mich., for plaintiff.

James K. O'Malley, Pittsburgh, Pa., James Roberts, Peter Moray, Louis E. Barden, Edward V. Boggs, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

Defendants Vigi, Pappas, Palmer, Kishner and Flowery were found guilty upon an indictment charging them with conducting an illegal gambling business and conspiracy to conduct an illegal gambling activity under 18 U.S.C. §§ 371 and 1955.[1] Defendant Erdmann was also indicted under 18 U.S.C. §§ 371 and 1955, but only convicted on one (1) count under 18 U.S.C. § 371.

Judgment was entered on the verdict and all named defendants have filed motions for a new trial with this court.

An informant had supplied information to the government that defendant Vigi was operating an illegal gambling operation, and was using a commercial restaurant, at 21576 Grand River, Detroit, Michigan, as a clearing house to receive all types of sports and horse betting from various branch bookmakers. Andrew Alberts was described as Vigi's telephone operator at this location.[2] Court authorized wiretap surveillance of the telephones used by Vigi disclosed the involvement of defendants Palmer, Pappas, Kishner, Flowery and Erdmann as branch bookmakers.

At trial, the government introduced into evidence gambling records which were seized from several of the defendants and extensive court authorized wire

---

[1]. 18 U.S.C. § 371 states in pertinent part:
"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."
18 U.S.C. § 1955 states in pertinent part:
"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
"(b) As used in this section—
(1) 'illegal gambling business' means a gambling business which—
(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
(2) 'gambling' includes but is not limited to pool-selling, bookmaking, . . .
(3) 'State' means any State of the United States, . . .
"(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.
"(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States . . ."
The Michigan statutes relevant to this case are M.C.L.A. 750.301, 750.304, 750.305, 750.314, 750.315, 750.157a, 750.167, 750.92 and 767.39.

[2]. Mr. Alberts suffered a heart attack prior to trial, therefore his case was severed from the trial of the other named defendants.

intercepted conversations of all defendants conducting gambling business.

Defendants have alleged several grounds on which they contend the court erred before and during the conduct of the trial.

Defendant Erdmann alleges the court erroneously admitted into evidence a portion of the wiretap logs which were read into the record at trial. Specifically, defendant Erdmann assigns error to the admission of the following colloquy:

"Alberts: Yes, well like I said I think she's (reference to defendant Erdmann) still booking, you know, look . . .

Vigi: Well she is

Alberts: For herself

Vigi: Definitely booking

Alberts: You know

Vigi: You know why, you know why, uh, I think where this all come about. I think it was a couple days ago when Bob (reference to defendant Robert Pappas) was pickin [sic] up from this other joint, I had to meet him on something and uh, you know he was telling me where this guy's getting a line from Betty.

Alberts: Uh huh

Vigi: Yea, you understand what I'm saying?

Alberts: Yes.

Vigi: And I turned around and said to him uh, what guy? Some guy in some bar out on the east side and I say uh, you mean to tell me she's giving him a line?

Alberts: Yea

Vigi: He says yea, that's what I hear, I say are you kiddin [sic] me . . . Bob thought she was still coming in with us."

———◆———

Defense counsel made timely objections to the admission of this conversation at trial. Defendant Erdmann now contends the conversation was multiple hearsay which involved an unknown man telling Bob something, which he relayed to Vigi, and which Vigi told Alberts.

■ It is a settled principle of evidence that statements made by a conspirator against the interest of a coconspirator, in pursuance of the conspiracy, are extrajudicial admissions not subject to the hearsay rule. 4 Wigmore, Evidence § 1079 (Chadbourn rev. 1970);

Rule 801(d)(2)(E), Proposed Federal Rules of Evidence.[3]

■ In the present case, the conversation between the co-conspirators Vigi and Alberts established that defendant Erdmann was already a member of the conspiracy. The statements made to Robert "Bob" Pappas by an unknown man merely dealt with the possibility that Erdmann was leaving the conspiracy to set up an independent bookmaking operation. The statements did not have any bearing on establishing Erdmann's role in the conspiracy. The statements

3. Although the Proposed Rules are not presently binding, they have been approved by the Supreme Court and should therefore be given special consideration. *See*, P.L. 93-12, 93d Cong., S. 583, 87 Stat. 9 (March 30, 1973) (delaying until further Congressional action the effective date of the Proposed Rules). *Desheles v. T. W. & C. B. Sheridan Co.*, 482 F.2d 852 (6th Cir., filed Aug. 2, 1973).

of Vigi and Alberts had already established that fact. It was not error, therefore, to admit that portion of Call #10 (EDM #102, on December 10, 1971, at 7:11 p.m.) in which Vigi and Alberts discussed defendant Erdmann's activities pertinent to the conspiracy. Moreover, defendant Erdmann was only convicted for conspiracy to conduct an illegal gambling activity under 18 U.S.C. § 371, and not for the substantive act of conducting an illegal gambling activity under 18 U.S.C. § 1955.

Defendants contend the verdict in this case was not based on substantial evidence.

█ The test to determine whether the jury's verdict is supported by substantial evidence is whether reasonable men, considering the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), rehearing denied, Kretske v. United States, 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222; United States v. Conti, 339 F.2d 10, 13 (6th Cir. 1964).

█ The evidence against the defendants, as to both counts of the indictment, consisted of approximately ninety (90) telephone calls, sixty (60) exhibits including gambling records seized from the operations "phone man", and testimony of associated bookmakers, bettors, and a qualified expert in gambling terminology and gambling operations. The telephone calls themselves included conversations in which each of the convicted defendants were participants discussing their operations and actually engaging in the conduct of the operation.

The testimony of Special Agents Whitcomb and Esposito of the Federal Bureau of Investigation aided the jury in understanding what was transpiring in each conversation (i. e., calling in groupings of wagers, giving line information, etc.) and the particular part in the scheme and operation played by each defendant.

The evidence presented to the jury showed each defendant had conspired with Vigi and Alberts to engage in some function of their operation. Vigi, Palmer, Kishner, Pappas and Flowery each went on to conduct all or part of some phase of the business, whether as a line source, collector, or bookmaker, within the time periods specified in the indictment. Finally, with the interpretive aid of the experts, this operation was shown to have been substantially continuous in accepting wagers on sports and horse events for at least six months, and on various days during January and February of 1972, the operation had daily, gross revenues of between $10,000 and $16,000. Such evidence established defendant's guilt beyond a reasonable doubt.

█ Defendants allege the court erred in permitting the jury to take the transcripts to the jury room during their deliberation.

It is well established that it is not an abuse of discretion to allow the jury to retain transcripts during the trial and their deliberations. United States v. Koska, 443 F.2d 1167, 1169 (2d Cir. 1971), cert. denied, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92; United States v. Carson, 464 F.2d 424 (2d Cir. 1972); United States v. Lawson, 347 F.Supp. 144 (E.D.Pa.1972).

Prior to trial defendants sought to suppress wiretap evidence obtained by the government because of lack of compliance with the authorization requirements of 18 U.S.C. §§ 2516 and 2518(1) (a) and (4)(d). This court, in United States v. Vigi, 350 F.Supp. 1008 (E.D. Mich.1972), denied defendants' motion stating:

"The statute is clear. Section 2516 (1) provides that 'The Attorney General, or any Assistant Attorney General specially designated by the Attorney General may authorize an application to a Federal judge . . .' In this case, Henry Petersen was only the Acting Assistant Attorney General. Until an Assistant Attorney General was appointed and affirmed

he held that position. In fact, subsequently he was confirmed by the Senate.

\*　\*　\*　\*　\*　\*

"Affidavits of Petersen and John Mitchell have been filed. They establish that Petersen was specially designated by Mitchell to authorize applications. They establish that Mr. Petersen recommended the authorization be granted. They also establish that the Attorney General himself reviewed these applications and personally approved the request." 350 F. Supp. at 1009.

Defendants now contend the recent decision in United States v. Sklaroff, 362 F.Supp. 478 (D.C.S.D.Fla.1973), would invalidate the reasoning in the earlier *Vigi* opinion and require a new trial based on the erroneous admission of the intercepted conversations at the earlier trial.

*Sklaroff* was one of several cases consolidated on a remand for further consideration in light of United States v. Robinson [4] for an evidentiary hearing to determine whether the applications for electronic interception orders presented to judges in those cases were properly authorized. A hearing was held on March 19–20, 1973. The court heard testimony from John Mitchell, former Attorney General of the United States; Will Wilson, former Assistant Attorney General in charge of the Criminal Division of the Department of Justice; Henry Petersen, now Assistant Attorney General in charge of the Criminal Division; Sol Lindenbaum, Executive Assistant to the Attorney General; and Harold Shapiro, Deputy Assistant Attorney General in the Criminal Division. Based upon the testimony of these individuals, and numerous exhibits presented at the hearing, the court suppressed the wiretap evidence in that case.

The hearing disclosed that on numerous occasions Henry Petersen, then Wilson's deputy, had exercised the blanket authority given him by Wilson to sign Wilson's name to Title III applications (wiretap authorizations). Petersen admitted signing Wilson's name to six (6) out of the eight (8) "Wilson" letters that were introduced into evidence at the hearing. The court found in *Sklaroff* that this type of procedure was not a first-person declaration contained in the authorization letters, rather they were institutional declarations by the Criminal Division of the Department of Justice. There was evidence in *Sklaroff* that neither Mitchell or Wilson knew what use was being made of the letters.

■ In the present case, however, a first-person declaration was contained in the authorization letter. Henry Petersen signed his own name to the letters, not the name of Wilson or anyone else. The congressional scheme behind 18 U.S.C. § 2518(1)(a) and (4)(d) of fixed responsibility was not subverted in this case as it was in *Sklaroff*. *See*, United States v. Pisacano, 459 F.2d 259 (2d Cir. 1972); United States v. Becker, 461 F.2d 230 (2d Cir. 1972).[5] Misidentification of the individual who authorized the application, or a total failure to identify anyone, are factors absent in the present case.

Suppression of the wiretap evidence is not appropriate in the present case where the interception was thoroughly reviewed, authorized by one with statutory authority and the lines of that authority are traceable to the approving and authorizing official or officials.

4. 468 F.2d 189 (5th Cir. 1972) (panel opinion); 472 F.2d 973 (5th Cir. 1973) (en banc opinion); 359 F.Supp. 52 (S.D.Fla.1973) (findings and conclusions on remand).

5. In *Pisacano*, Sol Lindenbaum had approved the wiretap applications, but signed Wilson's name to the letter, much like the case in *Sklaroff*. Since Petersen signed his own name in the present case, Chief Judge Friendly's view that "The legislative history indicates that the purpose of both subparagraph (1)(a) and subparagraph (4)(d) of § 2518 was simply to ensure 'that responsibility will be fixed.' S.Rep.No.1097, *supra*, 1968 U.S.Code Cong. & Ad.News at 2189 & 2192." 459 F. 2d at 264, n. 5, applies with even greater validity.

Defendants next contend their conviction of conspiracy represents a duplication of their convictions of violating 18 U.S.C. § 1955, and require the convictions be vacated.

 It is a fundamental principle that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses". Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961). As long as more than those necessary to complete the substantive offense (in this case five [5]) conspire to do so, the conspiracy and the substantive offenses are not conterminous. United States v. Becker, 461 F.2d 230, 234 (2d Cir. 1972); United States v. Riehl, 460 F.2d 454 (3rd Cir. 1972); United States v. Mainello, 345 F.Supp. 863 (E.D.N.Y.1972); United States v. Leon, No. 48080 (E.D.Mich.1973).

Defendants next contend there was no evidence to sustain their conviction of a conspiracy in which they all participated. In addition, they contend the jury should have been instructed that the defendants knew, or should have known, the extent of the illegal activity required by 18 U.S.C. § 1955. Both contentions raise the issue of what quantum of knowledge of the overall activity is required by a co-conspirator in a conspiracy prosecution.

 To be included as a co-conspirator, the individual need only know the general purpose of the conspiracy and not the part played by each of the members of the conspiracy, nor their identity, and the division of the spoils is immaterial. Poliafico v. United States, 237 F.2d 97 (6th Cir. 1956), cert. denied, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957); United States v. Chambers, 382 F.2d 910 (6th Cir. 1967). A single conspiracy exists when the co-conspirators perform similar roles at different stages for the same ends. Poliafico v. United States, *supra*. The court in *Poliafico* faced the question of multiple conspiracies in a narcotics conspiracy case where several suppliers of narcotics were found guilty of participating in the same conspiracy. The court stated:

"The over-all conspiracy was the plan, conceived by Poliafico and his associates, to buy and sell heroin at a profit. The suppliers knew that the purchases were for resale and they also knew that several conspirators were involved in the purchases. The fact that one supplier did not have dealings with another supplier does not matter. If each performs the same role at successive stages for the same ends, and both know and participate in the plan of the others to buy and sell heroin at a profit, each is guilty as a conspirator . . . The proofs of the Government show that all appellants were associated in this scheme, some by virtue of selling or delivering the heroin to the Poliafico group, others because of being associated with the group in carrying out the scheme by collecting money through resales of the drug, making payments to suppliers, or carrying on negotiations for the purchase or resale. All appellants knew of the conspiracy." 237 F.2d at 103, 104.

 Thus, multiple conspiracies do not exist merely because the co-conspirators perform varying functions or only knowingly align themselves with the "hub" of the conspiracy. If the plan or scheme has as its purpose a common goal to which the co-conspirators align themselves, then a single conspiracy exists.

 The instructions clearly and concisely charged that a defendant, to be convicted of "conducting" under 18 U.S.C. § 1955, must intentionally and knowingly do something that furthers all or part of the common goal of the business. Knowledge of the extent of the gambling business (i. e., if there were five or more persons engaged in its conduct, lasts more than thirty [30] days, or does more than two thousand dollars [$2,000] business in a day) is not required for conviction, and an instruction so requiring that knowledge and

intent would be outside the ambit of the statute.

The common goal to which all defendants subscribed was the participation in accepting wagers on sporting events and horse races, and the exchange of line information for the mutual profit and benefit of all. The roles of each defendant, whether manager, line source, phone operator, collector, or branch bookmaker, were all designed to further this common gambling activity. No attempt was made by the Government to show each conspirator knew the other or knew all of the details of the operation. However, the admissions of the defendants and the telephone calls themselves show each voluntarily established their arrangement with Vigi and conducted their activities with the knowledge that at least Vigi and Alberts were working in concert, as well as others, to sustain the mutually beneficial gambling operation.

Nothing in the statutory language suggests that all five (5) required persons must combine together or know of the extent of the gambling enterprise in order to be in violation of 18 U.S.C. § 1955(a). Defendants correctly identify the legislative intent behind § 1955 [6], but fail to accurately characterize how the statute fulfills that intent.

Obviously, "business-type gambling operations" and "syndicated operations" will generally involve combinations between defendants who are aware of the extent of the operation. But the paramount concern of Congress was with the impact of the illegal activity, not merely its size in physical terms. Therefore, knowledge by the participants of the extent of the illegal activity is irrelevant to the objective of Congress to control "operations [that] are so continuous and so substantial as to be of national concern."

Defendants also contend federal jurisdiction over this type of local, intrastate gambling activity impinges on areas of traditional state authority.

The authority of Congress to regulate this class of activities is clear. United States v. Harris, 460 F.2d 1041 (5th Cir. 1972); United States v. Becker, 461 F.2d 230 (2d Cir. 1972); Schneider v. United States, 459 F.2d 540 (8th Cir. 1972). See also, House Report on Organized Crime Control Act of 1970, H.R.Rep.No.91–1549, 91st Cong. 2d Sess. (1970); 2 U.S.Code Cong. & Ad. News 1970 at 4029. The concern of Congress was to regulate a particular class of gambling activities, which it found had an impact on interstate commerce. The defendant's lack of knowledge or the extent of the illegal gambling operations would not alter its nature under the Congressional determination as a class of activities properly subject to federal regulation. The sole question is whether the defendants' conduct falls within the class of regulated activities.

The fact defendants did not have knowledge of the extent of the business will not convert the large enterprise into a small, local concern which the states alone have authority to control. It is the impact of the enterprise which gives rise to federal jurisdiction, and the defendants' knowledge is irrelevant to this factual determination.

For the foregoing reasons, defendants' motions for a new trial are denied.

So ordered.

---

6. "The intent of section 1511 and section 1955 is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function": H.R.Rep.No.91–1549, 91st Cong. 2d Sess. (1970); 2 U.S.Code Cong. & Ad.News 1970 at 4029.