**UNITED STATES of America**

v.

**John McCRAE.**

**Crim. No. 71–684.**

United States District Court,
E. D. Pennsylvania.

July 21, 1972.

C. Oliver Burt, III, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

David F. Maxwell, Charles B. Burr, II, Philadelphia, Pa., for defendant.

OPINION

LUONGO, District Judge.

John McCrae was convicted by a jury on two counts charging (1) concealment, in a document required by the Welfare and Pensions Plan Disclosure Act, of the fact that a one million dollar Certificate of Deposit (C/D), issued by Provident Bank and owned by the Carpenters Health and Welfare Fund, had been loaned for use as collateral for a loan by

Provident Bank to a Vanderbilt Corporation, for which a fee of $10,500 had been paid to the Fund; and (2) embezzlement of the $10,500 fee, property of the Fund, in violation of 18 U.S.C. § 1027 and § 664.

There is now before the court defendant's motion for new trial, in support of which three grounds are asserted:

1. The government denied defendant due process of law by withholding evidence which would have been favorable to defendant;

2. The court permitted improper cross-examination of a character witness; and

3. Government counsel violated defendant's Fifth Amendment privilege against self-incrimination by improper comment on defendant's failure to testify.

The evidence, viewed in the light most favorable to the verdict winner, the government, disclosed the following facts:

Two employee benefit plans (including the Health and Welfare Fund, hereinafter Fund) were set up by employer building contractors and the Carpenters' Union. The plans were administered by four Trustees, two representing the employer building contractors and two representing the Union. McCrae was employed by the Trustees as the salaried supervisor of the plans responsible for day to day operations and supervision of other employees of the plans who kept the books and records of receipts and disbursements.

On January 30, 1969, pursuant to arrangements earlier made, the Vanderbilt Corporation borrowed from the Fund a one million dollar C/D for use as collateral for a loan and caused a check of Systems Capital Corporation in the amount of $10,500 to be delivered to representatives of the Fund as the fee for use of the C/D. McCrae was present at the Provident Bank when the C/D was turned over by two of the Trustees of the Fund. The $10,500 check was delivered either to McCrae or jointly to McCrae and one of the Trustees.

Under the terms of the plans, bank accounts could be opened only upon authorization of all four Trustees. On March 20, 1969, an account entitled "Investment Fund" (an account not authorized by the four Trustees) was opened at City Bank with the deposit of the $10,500 check. The account card bore the signature conceded to be that of John McCrae. There was no activity in the account until June 13, 1969 when it was closed by the cashing of a check drawn on that account bearing the alleged signature of John McCrae as maker and drawn to the order of a Joseph Gallagher. There were only two Joseph Gallaghers who were members of the Carpenters' Union at the time in question and each appeared and testified that he had not received the proceeds of that check.

James O. Whitall, who was the president of City Bank, testified that McCrae had approached him about opening an account as a means of diverting the $10,500 fee from the Fund. Whitall testified that although he knew it was illegal, he cooperated with McCrae because he didn't want to lose the Carpenters' Union business. He arranged to withhold statements for the account and he (Whitall) was present in the bank on June 13, 1969 when the check closing the account was cashed. Whitall verbally authorized the cashing of the check and when he did so, he saw McCrae standing at the teller's window.

There was no record in the books of the Fund of the loan of the C/D or of the fee earned for the loan. Such transactions should have been recorded in the books and, if recorded, would have been noted by the Fund's auditor in his report since such loan would have been beyond the powers of the Trustees under the terms of the plans. The forms required to be filed under the Welfare and Pension Plans Disclosure Act were prepared from the books and records of the Fund and failed to disclose the transaction or the fee.

## DISCUSSION

The three grounds asserted by defendant in support of the motion for new trial will be discussed separately. Considered separately or in combination, they do not merit a new trial and the motion will therefore be denied.

### 1. *Withholding of evidence favorable to defendant.*

This contention is made under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant argues that the government knew or could have ascertained that City Bank was equipped with two surveillance cameras; that the cameras operated during the Bank's working hours in alternating thirty second cycles; that the film for June 1969 does not picture McCrae in the Bank, and more specifically, does not picture him standing at the window of teller No. 3 (whose symbol appears on the cashed check); and that the film for March 1969 "does not picture defendant going to or coming from Whitall's office or standing at any of the teller's windows where he allegedly deposited the check in question on March 20, 1969." (Defendant's Brief, p. 5)

In Brady v. Maryland, Brady and a companion, Boblit, were convicted of murder in separate trials and sentenced to death. At Brady's trial, he took the stand and admitted participation, but claimed that Boblit did the actual killing. Brady's counsel, in summation, conceded that Brady was guilty of murder in the first degree and sought only to avoid the death penalty. Prior to trial, Brady's counsel had asked the prosecution to permit him to examine Boblit's extra-judicial statements. Several were shown, but one in which Boblit admitted that he had done the actual killing was withheld. The Supreme Court held that

" . . . the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196.

The rule of *Brady* was not violated in the instant case. The government points out, in answer to defendant's contention, that several months prior to trial, six photos developed from film from bank surveillance cameras for June 1969 depicting McCrae in City Bank were shown to defendant's counsel.[1] The government asserts that it was not in possession of, nor was it interested in, any photos or developed film for March 1969. The film was then in its undeveloped state in the custody of Federal Deposit Insurance Company, receiver for City Bank. In view of the other evidence which the government had, it made no effort to obtain the March film. It is the prosecuting attorney's position that he had disclosed the fact that bank surveillance film existed and revealed all he knew and was under no obligation affirmatively to ascertain what said film did or did not show.

There is no contention by defendant that there was a knowing withholding of information by the prosecution here[2] as there was in *Brady*. Defendant's position really is that the government is under the affirmative obligation to investigate all possible sources of information, exculpatory as well as incriminatory, and to reveal to defendant anything, including that of a negative nature, that could conceivably be of ben-

---

1. Defendant was represented at trial by counsel other than the one arguing the motion for new trial.

2. There is an affidavit from a Mr. McClintock, manager of a Girard Bank branch which apparently took over the business of the City Bank, to the effect that after he testified at McCrae's trial, an investi-gator for the Labor Department had stated to him "Phew, I'm glad you didn't [mention anything about use of City Bank surveillance films] because those films would hurt us." There is nothing to indicate what the investigator meant by the statement and nothing to indicate that the prosecuting attorney was aware of it.

efit to defendant. This, in my view, goes far beyond the requirements of *Brady*. Defense counsel had been advised of the existence of surveillance film. There was available to him, just as there was to the government attorney, the opportunity to investigate to determine what such films disclosed or failed to disclose.

At oral argument and in the "Reply Brief in Support of Defendant's Motion for New Trial," replacement counsel has suggested that if the court should conclude, as it has, that the prosecuting attorney had discharged the government's obligation by revealing the existence of bank surveillance films, then defendant's trial counsel was incompetent for failing to investigate further. This argument demonstrates once more the keenness of hindsight, but hindsight is not the measure of counsel's competence. As was stated by the late Judge Freedman in Moore v. United States, 432 F.2d 730, 736 (3d Cir. 1970):

"  .   .   .   the standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place.

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard." (Footnotes omitted).

The court is able to attest, from the first hand experience of having had to consider and rule upon trial counsel's pretrial motions, that defendant's trial counsel was most competent and diligent in the pretrial preparation of defendant's case.

More important, from the standpoint of the merit of counsel's *Brady* contention, I have serious doubt as to the evidential value of the film. In the first place the films were apparently not kept by specific day and date, the rolls of film being replaced every few weeks as it was thought they were needed. They did not operate constantly throughout the work day; they did not cover all parts of the Bank; and there is an indication that if the cameras were not shut off at night, as sometimes happened, the film ran out before the time for scheduled replacement with the result that the cameras sometimes operated without film. In the second place, McCrae's presence in the Bank was not crucial to either of the counts. The first count, failure to disclose information required by the Welfare and Pension Plans Disclosure Act, was established completely by events outside the City Bank. That charge was established by McCrae's knowledge of the events at the Provident Bank involving the loan of the C/D and the delivery of the check, his position as supervisor of the plans, and by the failure of the Fund's books to disclose any record of the loan of the C/D or of the fee paid therefor. The second count, embezzlement, was likewise established by events unrelated to McCrae's presence or absence from City Bank. This charge depended upon evidence that only the four Trustees were authorized to open accounts; the "Investment Account" was not authorized by the Trustees; McCrae's signature was on the "Investment Account" card; and the testimony of the bank president that McCrae opened the account as a means of diverting the fee from the Fund. This evidence, none of which depended upon McCrae's presence in City Bank on the days in question, was sufficient to prove the charge of embezzlement, and the jury was so instructed. (See N.T. 4–90 to 4–92; 4–93)

2. *The court permitted improper cross-examination of a character witness.*

██ Defendant called 19 witnesses who testified that defendant enjoyed an excellent reputation for being an honest and law abiding citizen. On cross-examination of the first "character" witness, the government attorney asked (N.T. 2–210)

"Mr. Slezak, have you heard that John McCrae has been indicted by the Fed-

eral Grand Jury for accepting bribes and kickbacks in two separate cases in addition to this case?"

Defense counsel objected to the question and asked for a mistrial. Because the question related to arrests which were contemporaneous with, rather than prior to, the charge for which the defendant was on trial, the court sustained the objection but denied the request for mistrial, and cautioned the jury (N.T. 2–211)

"THE COURT: Members of the jury, there are certain questions that may be asked on cross-examination when evidence of good character is produced. There are other questions which are not proper, and those questions, in my view, involve whether some other charges may be connected with the one for which the person is on trial. The government believes it was correct in asking that question. The defendant believes it was so wrong that it (sic) has asked for a mistrial, but I have denied both requests. I simply ask you to disregard any testimony, or that question, rather, that was asked concerning other charges at or about the same time as this charge."

Defendant now argues that the court should have gone through the various procedures outlined in Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), to ascertain that there was a proper basis for the question before permitting it to be asked. *Michelson* spoke of procedures to be followed before permitting questions bearing on defendant's reputation to be asked and answered. The quick answer to defendant's contention is that the court did not permit any examination at all into the subject. The court's cautionary instruction was more than adequate to dispel any possible prejudice that might have resulted from the mere asking of the question.

3. *Comment on defendant's failure to testify.*

Little purpose would be served by repeating herein those portions of government counsel's closing speech which defendant contends constituted improper comment on his failure to testify. For the purpose of preserving them for posterity and for the convenience of the reviewing court, they are reproduced in full in the appendix attached hereto, as copied from defendant's brief.

██ Reference by the prosecutor to testimony as being uncontradicted does not violate the privilege against self-incrimination. United States v. Giuliano, 383 F.2d 30 (3d Cir. 1967); nor does reference to failure to produce a witness or testimony to rebut testimony presented by the government constitute impermissible comment on defendant's failure to testify. United States v. Smith, 421 F.2d 1299 (3d Cir. 1970). If any of the comments in government counsel's closing speech raised any doubts at all about the effect of defendant's failure to testify, they were unquestionably resolved by the court's instructions on the subject (at N.T. 4–77, 4–78):

"Members of the jury, I have told you that a defendant enjoys the presumption of innocence. He has the right not to take the stand in any case in which he is charged, because it is always the government's burden to prove guilt beyond a reasonable doubt, and if the defendant does not take the stand, as Mr. McCrae did not in this case, you may not draw any inferences whatsoever from the failure to take the stand. That must never enter into your deliberations. He has the absolute and unqualified right not to take the stand. He has the absolute and unqualified right to ask the government to prove its case as it is required to do beyond a reasonable doubt without any help from him. You must bear that in mind, members of the jury. You must never, never allow that to enter your consideration at any point."

## ORDER

This 19th day of July, 1972, it is ordered that defendant's Motion for New Trial is denied. The defendant shall appear for sentencing upon notice.

### APPENDIX

The portions of government counsel's summation of which defendant complains are the following (copied from defendant's Brief, pages 11 and 12):

"Who deposits checks in accounts? Do you go around depositing checks in other people's accounts? Do other people go around depositing checks in your accounts? Who then put the check in Mr. McCrae's account? I submit to you the only logical inference is that *John McCrae put that check in there. If you have an account, you see to it that you get money into that account and no one else does.* (N.T. 4–15). (emphasis added)

\* \* \* \* \* \*

" . . . You heard no contradictory evidence from the defense to the effect that Mr. McCrae was authorized to open this account. You heard no contradictory evidence to the effect that it was opened temporarily for safe keeping of the check. Obviously, that would be preposterous. So what you have is this check being deposited in an unauthorized account.

Right then and there the embezzlement is complete, because right then and there the check and the money it represented was diverted . . . . It was no longer Carpenters' money. They no longer had it once it went in that account. John McCrae took it as his own right then and there. He appropriated it. He was free to spend it any time once it was in that account.

The big question you have to ask yourselves in this case is this: *If John McCrae is indeed innocent of these charges, why did he open that account?* The account was opened on March 20 for that one check. The bank statements indicate nothing at all happened in the account from that point on . . . until June 13 . . . when the $10,500 check left the account. I submit to you, ladies and gentlemen, that the evidence overwhelmingly demonstrates that the sole purpose for opening this account was to steal this check. (N.T. 4–16 and 4–17). (emphasis added)

\* \* \* \* \* \*

" . . . and once again I ask you to keep in mind, *what purpose did John McCrae have in setting up this account if the purpose was not to steal the money?* . . . the theft of that check . . . was complete as soon as that check went into the account, because right then and there he took it as his own. He obviously was not authorized to do that . . . ." (N.T. 4–18). (emphasis added)

\* \* \* \* \* \*

Now, the Joseph Gallagher check has right on the front of it a stamped number 3 . . . . This is a photocopy. *The reason it is a photocopy is that the original . . . as you know from your own experience, gets sent back to the person who owns the account.* Your checks come back; my checks come back. So all we have to work with is the photocopy." (N.T. 4–19).