**The UNITED STATES**

**v.**

**Matthew WHITAKER et al.**

**Crim. No. 022273–1.**

United States District Court,
M. D. Pennsylvania.

Feb. 28, 1974.

See also, 3rd Cir., 474 F.2d 1246.

Laurence Kelly, Scranton, Pa., for the U. S.

Joseph F. Orso, Jr., Ronald C. Travis, Martin M. Fine, Williamsport, Pa., H. Russell Smouse, Joseph Rosenthal, Baltimore, Md., for defendants.

## OPINION

MUIR, District Judge.

On February 22, 1973, Defendants Matthew Whitaker, Stephen Santai, John Joseph Pancerella, Charles Nicola, and Benito Mione were charged in a two-count indictment with conducting an illegal gambling business in violation of 18 U.S.C. § 1955,[1] and conspiracy to do so in violation of 18 U.S.C. § 371. Following a jury trial beginning September 6, 1973 and ending September 18, 1973, all of the Defendants were adjudged guilty of both counts. Before the Court are several motions by all Defendants for a new trial and for judgment of acquittal. The issues presented by the various motions will be discussed *seriatim*.

## 1. DID THE GOVERNMENT PROVE THAT THE CRIME OF CONDUCTING AN ILLEGAL GAMBLING BUSINESS WAS COMMITTED WITHIN THE MIDDLE DISTRICT OF PENNSYLVANIA?

The basic constitutional provisions contained in Art. III, § 2 and in the Sixth Amendment of the United States Constitution are implemented by F.R. Crim.P. 18 which provides:

"Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed."

The indictment charged the Defendants with conducting a gambling business within the Middle District of Pennsylvania. The bulk of the evidence introduced by the Government consisted of recordings of telephone conversations by and between the several Defendants in furtherance of the gambling business. The evidence, if believed, demonstrated

---

1. 18 U.S.C. § 1955 provides in relevant part:
"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
(b) As used in this section—
(1) "illegal gambling business" means a gambling business which—
(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."
"(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established."

that Defendant Whitaker in Pottsville, Pennsylvania, furnished the daily "line" on sporting events by telephone calls to and from Defendant Pancerella in Mt. Carmel, Pennsylvania. Pancerella would thereafter transmit the "line" information, by telephone, to Defendants Mione and Nicola in the Mt. Carmel-Shenandoah area. At the end of the day, Mione and Nicola would notify Pancerella of the bets which had been taken. Pancerella would transmit by telephone the total of the bets to Defendant Santai in Pottsville. While the Mt. Carmel-Shenandoah area is within the Middle District of Pennsylvania, Pottsville is in the Eastern District of Pennsylvania. Defendants argue that any conduct in furtherance of the gambling business by Santai and Whitaker consisted only in placing or receiving telephone calls from outside this District to Mount Carmel, within the District. Therefore, Defendants contend, as to Santai and Whitaker, this Court had no venue because they did not commit the offense charged in the indictment within the Middle District. And, Defendants argue, since it was improper to prosecute Santai and Whitaker in this District, the charges against the other three Defendants should also be dismissed because there would no longer be the requisite 5 or more persons participating in the gambling business as required by 18 U.S.C. § 1955.

 It has long been held that where a conspiracy is comprised of many transactions in various districts, venue as to all conspirators is proper in any district in which any act in furtherance of the conspiracy was committed by any of the conspirators. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L. Ed. 1114 (1912); United States v. Cohen, 197 F.2d 26 (3d Cir. 1952). Similarly, operating an illegal gambling business is a crime which may include conduct in several different districts. To cover the venue requirements for this type of crime, Congress enacted 18 U.S. C. § 3237 which was derived from an 1867 statute defining conspiracy, see Wright and Miller, Federal Practice and Procedure, § 303, and which provides in pertinent part:

"(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

"Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves."

Thus, prosecutions of crimes under the securities acts consisting of using the mails to employ a scheme to defraud purchasers of securities may be brought in the district of the mailing, the district of receipt, and in the district where the scheme was formed. See United States v. Cashin, 281 F.2d 669 (2d Cir. 1960). It has been held that 18 U.S.C. § 3237 applies to crimes involving interstate telephone calls either on the rationale that the crime began in one district and was completed in another, or the rationale that the statutory language "transportation in interstate commerce" encompasses the use of wire facilities for the transmission of messages. United States v. Spiro, 385 F.2d 210 (7th Cir. 1967); United States v. Synodinos, 218 F.Supp. 479 (D.Utah 1963). In the case at bar, prosecution of all of the Defendants in this District was proper where it was proven that in conducting an illegal gambling operation each Defendant placed or received telephone calls in or to points within the Middle District of Pennsylvania.

2. CAN DEFENDANTS BE CONVICTED OF BOTH A VIOLATION OF 18 U.S.C. § 1955, AND CONSPIRACY TO VIOLATE THAT STATUTE?

Defendants point out that in order to prove a violation of 18 U.S.C. § 1955,

the Government must prove that five or more persons conducted a gambling business illegal under state law. They cite "Wharton's Rule" which provides:

"An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission."

1 Wharton's Criminal Law and Procedure, § 89, p. 191 (Anderson Ed.1971). The principle of Wharton's Rule has been accepted by the federal courts where it has been held that a conspiracy charge may not be added to the substantive charge "where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime." Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946).

Courts have divided on the applicability of Wharton's Rule to facts similar to those in the case at bar. Two district courts, in cases involving thirteen and eight defendants respectively, held that the defendants could not be prosecuted both for conspiracy to violate § 1955 and for violation of § 1955 itself. United States v. Greenberg, 334 F.Supp. 1092 (N.D.Ohio 1971); United States v. Figueredo, 350 F.Supp. 1031 (M.D.Fla. 1972). A contrary result was reached in United States v. Becker, 461 F.2d 230 (2d Cir. 1972), petition for cert. filed, 41 U.S.L.W. 3160 (U.S. July 28, 1972) (72–158) where it was stated:

". . . in this case an additional two persons, or seven in all, were named in the indictment as having engaged in the conspiracy, whereas the substantive offense required the participation of only five . . . .. As we have recently reiterated, as long as the conspiratorial concert of action and the substantive offense underlying it are not coterminous and fewer participants are required for the commission of the substantive offense

than are named as joining in a conspiracy to commit it, there is no infirmity in the conspiracy indictment." 461 F.2d at p. 234. From this language, it would appear that the *Becker* court would allow convictions for conspiracy and the substantive offense only when there were more than five persons engaged in the illegal gambling business. In the most recent of this line of cases, the court in United States v. Hunter, 478 F.2d 1019 (7th Cir. 1973) cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L. Ed.2d 107, eschewed the numbers game and found a conspiracy violation improper because the proof of intent required for the violation of § 1955 was not different from the evidence required to sustain the charge of conspiracy:

". . . [E]ven though five or more persons are named in the indictment, a charge of conspiracy to violate § 1955 may not be maintained if it comprehends nothing more than the agreement which those persons necessarily performed by the commission of the substantive offense itself." 478 F.2d at p. 1026.

While I find the reasoning in *Hunter* more persuasive, this Court is bound by a recent decision of the Court of Appeals for this circuit which followed the Becker rationale. United States v. Iannelli, 477 F.2d 999 (3d Cir. 1973), cert. denied, 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243. However, the *Iannelli* case involved more than 5 participants and the Court specifically avoided a decision on the applicability of Wharton's Rule where, as here, only five participants in the gambling business are named. In my view, the conspiracy conviction in the case at bar is improper under the rationale of either *Hunter* or *Becker*.

■ The Government contends that the requirement of § 1955 that at least five persons conduct the gambling business is a jurisdictional element as differentiated from an element of criminality. It argues that group activity is not part of the crime itself, but is only included

in the statute as a ground for federal jurisdiction. I fail to grasp the significance of this point. While the 5 person requirement may be jurisdictional, unless it is met no federal crime has been committed. Although a jury need not find knowledge on the part of a defendant of such a jurisdictional element, United States v. Iannelli, *supra*, it must nevertheless find the existence of the element. And the effect of the requirement of § 1955 that five **or more** persons engage in the **gambling** business is necessary to build into the crime a conspiracy by the five participants to conduct a gambling business. Without such an agreement, the intent of the defendants to engage in the gambling business could not be found. The Court is not persuaded by the Government's example of how a conspiracy to violate § 1955 may exist without participation in the gambling business. We have the opposite situation here, and I have concluded that participation in the gambling business in this case could not have existed without a conspiracy to do so. Because I find that "there is no element in the conspiracy which is not present in the completed crime," Pinkerton v. United States, *supra*, Defendants' motion for judgment of acquittal on Count II will be granted.

### 3. DID THE COURT ERR IN FAILING TO CHARGE THE JURY IN THE LANGUAGE OF THE INDICTMENT?

■■ In charging the jury on one of the elements of a violation of 18 U.S.C. § 1955, the Court, in conformance with the statute, stated that an illegal gambling business involves five or more persons who "conduct, finance, manage, supervise, direct *or* own all or a part of a gambling business." (emphasis supplied). The indictment charged that the Defendants did "conduct, finance, manage, supervise, direct *and* own . . . an illegal gambling business . . . ." (emphasis supplied). Since the Gov-

ernment introduced no evidence that any of the Defendants owned the gambling business, Defendants contend that the Court's charge in disjunctive terms was prejudicial error. However, it is settled that where a statute lists several acts in the disjunctive which constitute a crime, a conviction is valid where any one of the acts is proven even though the indictment links the alleged acts in the conjunctive. United States v. McCann, 465 F.2d 147, 162 (5th Cir. 1972). See Turner v. United States, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).

### 4. DID THE COURT ERR IN REFUSING TO INCLUDE THE CONCEPT OF "MORAL CERTAINTY" IN ITS CHARGE ON REASONABLE DOUBT?

■ In its charge to the jury on what constitutes reasonable doubt, the Court denied Defendants' requested instruction that "[a] reasonable doubt exists whenever, after careful and impartial consideration of all the evidence in a case, the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge." The "moral certainty" concept is a standard part of the reasonable doubt charge in federal courts. Devitt and Blackmar, Federal Jury Practice and Instructions, § 11.01. Defendants have not objected to other portions of the reasonable doubt charge given by the Court. In my view, a charge on "moral certainty" tends to confuse the concept of reasonable doubt. Some jurors may interpret it to mean a doubt based on something other than reason. In United States v. Johnson, 343 F.2d 5 (2d Cir. 1965), the Court found inadequate a charge that the jury should acquit a defendant unless "morally convinced of his guilt." The position of the Court of Appeals for this circuit is unclear. While in United States v. Evans, 359 F.2d 776 (3d Cir. 1966), the Court affirmed a conviction where a requested charge on moral certainty was denied,[2] in United States v. Stubin, 446

2. United States v. Evans, 239 F.Supp. 554 (E.D.Pa.1965).

F.2d 457 (3d Cir. 1971), the court reviewed a charge containing the moral certainty concept and found it adequate. In neither case did the Court have before it the question of whether omitting the "moral certainty" charge was error. I have concluded that where, as here, the remainder of the charge adequately and properly defines the term "reasonable doubt," it was not error to refuse to give an instruction on "moral certainty."

## 5. DID THE COURT ERR IN REFUSING TO ALLOW FULL EXAMINATION OF WITNESSES ON THE ISSUE OF MINIMIZATION OF THE INTERCEPTION OF TELEPHONE CONVERSATIONS AND IN REFUSING TO SUBMIT THE MINIMIZATION ISSUE TO THE JURY?

■ On December 15, 1972, the Honorable R. Dixon Herman of this Court signed an order authorizing the interception of telephone communications, the recordings of which ultimately made up the bulk of the evidence presented by the Government in the trial of this case. Pursuant to the mandate of 18 U.S.C. § 2518(5), the authorization order provided, *inter alia,* that the intercept "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." Following arraignment, the Defendants filed several motions including various motions to suppress the wiretap evidence. The suppression motions, which raised the minimization issue, were referred by this Court to Judge Herman because he granted the authorization order. On June 22, 1973, Judge Herman conducted a hearing on the motions to suppress. Much of the evidence and arguments presented at that hearing went to the question of whether the wiretaps in question were conducted in such a way as to minimize the interception of communications not otherwise subject to interception. On July 27, 1973, Judge Herman entered an order denying all of the suppression motions.

At the trial in this case, the issue of minimization was raised repeatedly, particularly during the examination of the F.B.I. agents who made and supervised the wiretaps. Because of the possibility that new evidence on the minimization issue might be uncovered, and in order to provide Defendants with a complete record on which to base any future appeal of the order denying the suppression motions, the Court permitted a liberal inquiry on matters relating to minimization. But when it appeared that matters presented at the hearing before Judge Herman were merely being rehashed, the Court cut off examination of the witnesses on this issue because of the time factor in an already lengthy trial. In view of the fact that Judge Herman had already decided the minimization question adverse to Defendants, the Court refused to review that decision or to submit the issue to the jury.

There are two reasons why it was proper not to submit the minimization issue to the jury. First the suppression of wiretap evidence is a matter for the court to decide. F.R.Crim.P. 41(e) provides a procedure whereby the Court decides, before trial, motions to suppress evidence allegedly seized by an unlawful search. United States v. Wheeler, 172 F.Supp. 278 (W.D.Pa.1959), aff'd 275 F.2d 94 (3d Cir. 1960), cert. denied, 363 U.S. 828, 80 S.Ct. 1597, 4 L.Ed.2d 1523. See Steele v. United States, 267 U.S. 505, 45 S.Ct. 417, 69 L.Ed. 761 (1925). In language very similar to Rule 41(e), 18 U.S.C. § 2518(10)(a) provides the same pre-trial procedure for motions seeking to suppress wiretap evidence. It can only be concluded that issues concerning the validity of wiretap evidence, like issues concerning the legality of searches and seizures, are matters for the court to decide, not the jury.

Second, it would have been improper for this Court to reopen the issue of minimization in light of Judge Herman's order denying the suppression motion, since judges should not put themselves in a position where they might be required to overrule the decision of a

judge of the same court in the same case. United States v. Wheeler, 256 F. 2d 745 (3d Cir. 1958), cert. denied, 358 U.S. 873, 79 S.Ct. 111, 3 L.Ed.2d 103, rehearing denied 358 U.S. 913, 79 S. Ct. 229, 3 L.Ed.2d 234. Defendants contend that new evidence on the minimization issue was presented at the trial which would allow this Court to reopen the issue. See United States v. Wheeler, *supra*. However, any difference in the evidence presented at trial and that presented to Judge Herman would seemingly go against Defendants' position that suppression was improperly denied. At both the July 22, 1973 hearing and at the trial, F.B.I. Agent Rogers testified that the agents intercepting the telephone calls stopped recording upon determining that the phone calls were personal in nature and not gambling calls. At the hearing Rogers testified that the agents continued to listen to the unrecorded calls to determine when a call was completed, whereas at the trial evidence indicated that the agents not only stopped recording when a call was determined to be personal, but that they also removed their earphones until a device on the machines indicated that the call was over. The Court gave Defendants ample opportunity at trial to elicit new evidence, and only when it became clear that no new and material evidence was forthcoming did the Court terminate inquiry on this issue.

## 6. SHOULD THE GOVERNMENT HAVE BEEN PERMITTED TO CALL JULIA BUTCHKO AS A WITNESS?

■ Voice identification was made of Defendant Pancerella on recorded phone conversations to and from telephone number 339–5981, listed in the name of John Turo, 301 South Peach Street, Mt. Carmel, Pennsylvania. Over Defendants' objections, the Government was permitted to call Julia Butchko who resided at the above address and at whose apartment Pancerella allegedly engaged in the recorded gambling related telephone conversations. Defendants feared that the jury might reasonably infer that Pancerella was a married man, that Miss Butchko was his mistress, and that the resultant prejudice to Pancerella and the other Defendants outweighed the value of Miss Butchko's testimony. Besides objecting to the calling of Miss Butchko, all Defendants except Pancerella made motions that their trial be severed from Pancerella's.

Having been granted immunity by the Government, Miss Butchko testified that Pancerella used the name John Turo, and that on the days on which the phone calls were being intercepted and recorded, Pancerella was using the telephone. Miss Butchko also testified that Pancerella's nickname was McGee, a name that was used in several of the recorded conversations. She also confirmed that she and Pancerella bought a couch in Shamokin, a fact which also came up during one of the recorded phone calls.

Although this testimony was not absolutely vital to the prosecution, it certainly was highly relevant in identifying Defendant Pancerella as one of the participants in several telephone conversations played during the trial. No mention was made during Miss Butchko's testimony that she and Pancerella enjoyed any special relationship, although I suppose the jury might infer that the Defendant was more than a casual visitor. There was no evidence at trial that Pancerella was a married man. In my view, the relevant and probative value of Miss Butchko's testimony outweighed any prejudice to Pancerella and the other Defendants. The witness was properly allowed to testify, and the motions of all Defendants except Pancerella for severance were properly denied.

## 7. WERE THE DEFENDANTS ENTITLED TO A MISTRIAL BECAUSE OF COMMENTS MADE BY THE PROSECUTOR IN HIS CLOSING ARGUMENT?

After the Assistant U.S. Attorney's closing argument, Defendants made triple-grounded motions for mistrial which were denied by the Court. Two of the grounds concerned comments by the As-

sistant U.S. Attorney in his closing argument and will be covered in this discussion. The other ground will be covered in the following section of this Opinion.

■ Defendants first contend that the prosecutor's reference to "setting up camp at Julia Butchko's house" was a needless and prejudicial remark in that it suggested an illicit sexual relationship between Defendant Pancerella and Miss Butchko. The full context of the remark was as follows:

> "Do we rely purely on voice identification? No. That is not necessary at all. Just go right to the telephone records of the alias John Turo at 301 South Peach Street, setting up camp at Julia Butchko's house, setting up this business, and we turn to the telephone records and we look at this particular date . . . ."

Transcript Vol. X, p. 34. In light of the explanatory phrase "setting up this business" which follows the "setting up camp" remark, it is clear, at least to this Court, that the Assistant U.S. Attorney was merely stressing the evidence which tended to show that Defendant Pancerella conducted the gambling operation from Miss Butchko's apartment. Admittedly, this was a poor choice of words, but the comments were not so gross as to constitute prejudicial error. United States v. Benson, 487 F.2d 978, (3d Cir., filed November 26, 1973).

■ Defendants also objected to the comments of the Assistant U.S. Attorney concerning the voice identification testimony and Defendants' failure to produce any contrary evidence:

> "Defense? A tremendous defense. We have attorneys get on this and they battered every point we brought up, everything they could get out of it, but a little thing like bringing in an independent tape in here from five friends from Shenandoah saying you can't pick out Pancerella's voice, can you? Any of that? No. They knew it was John Pancerella and I respectfully submit that you knew, too."

Transcript, Vol. X, p. 26–27. Defendants argue that this comment was inferentially directed to the Defendants' failure to testify in their own defense. In my view, no such inference should be drawn. It is unclear whether the Assistant U.S. Attorney was suggesting that on cross-examination of the Government's voice identification witnesses counsel for Defendants could have tested the witnesses' ability to identify Defendants' voices by playing another tape recording of Defendants' own making, or whether he was commenting on the failure to produce readily available witnesses who could give contrary voice identification testimony. In either event, the remark does not fall within the proscription against remarks about the failure of an accused to testify. See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Drawing the jury's attention to a defendant's failure to present witnesses to overcome the prosecution's evidence is fair argument and not violative of any of the rights of an accused. United States v. McClain, 469 F.2d 68 (3d Cir. 1972); United States v. McCrae, 344 F. Supp. 942 (E.D.Pa.1972), aff'd, 475 F.2d 1397 (3d Cir. 1973). See also United States v. Smith, 421 F.2d 1229 (3d Cir. 1970).

8. WERE THE PLAYING OF RECORDED TELEPHONE CONVERSATIONS CONTAINING OBSCENE LANGUAGE DURING THE TRIAL AND DURING THE PROSECUTOR'S CLOSING ARGUMENT PREJUDICIAL TO THE DEFENDANTS?

Many, if not most, of the recorded telephone conversations played at the trial began and ended with informal chatter containing obscene words. Defendants contend that the offensive language was prejudicial to the Defendants, and that, since summaries of the original tapes were prepared by the Government for the purpose of trial, it would have been a simple matter to exclude those portions of the conversations which contained the obscenities. De-

fendants also contend that the Court erred in denying their motions for a mistrial when the Government played a tape containing obscene language during the closing argument.

The Court is of the view that the playing of recorded conversations containing offensive language could not have reasonably been avoided. While the Government did prepare summaries of the tapes for trial, the summaries were of calls which were complete, from dialing until hanging up. Recordings of the middle portion of conversations, those portions relating only to the transmission of "line" and betting information, might have raised questions in the minds of the jurors as to what the other portions of the conversations were about. Had the obscenity been excluded, the recordings may well have consisted of an incomprehensible series of numbers. The preliminary and closing remarks of the callers often contained, besides obscenity, names and nicknames useful for identification purposes.

Any prejudice which the offensive language might normally engender was minimized by the Court's inquiring of the jurors on voir dire, at the request of Defendants, whether any of the jurors had " . . . any objection to obscenity, even vile obscenity, about which there might be some testimony which would create prejudice in your minds against anyone if you heard it in a conversation." There was no affirmative response. Transcript, Vol. 1, p. 23. Furthermore, in his opening statement to the jury, the Assistant U.S. Attorney stressed: "So we do not offer it [recordings containing obscene language] to prejudice your thinking in any respect, and we certainly hope that it will not interfere with your consideration of the elements of this case." Transcript, Vol. 1, p. 56. As to the tape containing obscene language played during the closing argument, the language was no more offensive than that heard by the jury throughout the trial. Although the necessity of playing tapes with obscene language throughout the

trial was unfortunate, a new trial on this ground is unwarranted.

9. WERE WORK TAPE II AND WORK TAPE III PROPERLY AUTHENTICATED PRIOR TO BEING ADMITTED INTO EVIDENCE?

F.B.I. Agent Rogers testified that at the time the interceptions of the telephone conversations were conducted, the conversations were recorded on two tapes, the so-called "master tape" and "Work Tape I." The "master tape" was impounded by the Court. "Work Tape I" was used by the Government in preparing this case, and everything contained thereon is contained on the "master tape." In order to conserve time at trial, the Government prepared two summary tapes of selected conversations. Mr. Bott, a special employee of the F.B.I., testified that he prepared these summary tapes, designated "Work Tape II" and "Work Tape III," directly from "Work Tape I." "Work Tapes II and III" were the tapes played at trial, and everything they contained was contained on "Work Tape I." In addition, as conversations were played, each F.B.I. agent who in fact recorded the particular conversations and made notes thereof in his log testified as to the accuracy of the tapes. Thus, contrary to the contentions of Defendants, there was substantial evidence of the authenticity and accuracy of the summary tapes played at trial. No contradictory testimony was introduced by the Defendants either directly or on cross-examination of the Government witnesses. In fact, the Defendants never seriously suggested that the summary tapes were inaccurate. Under these circumstances, admission of the tapes into evidence and the playing of them at trial was proper. See United States v. Knohl, 379 F.2d 427 (2d Cir. 1967).

10. WERE THE VOICE EXEMPLARS PLAYED AT TRIAL MADE UNDER SUBSTANTIALLY SIMILAR CIRCUMSTANCES AS THE WIRETAP TAPES?

The Court granted the Government's pre-trial request to make

voice exemplars of each of the Defendants. These exemplars were played at trial for purposes of comparison with the voices on the wiretap tapes. The use of voice exemplars does not violate a defendant's constitutional privilege where they are used only to measure the physical properties of the person's voice and not for the testimonial content. United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). Defendants do not object to the content of the exemplars, but they contend that they must be made under substantially similar circumstances as the recordings with which they are compared. The Court is uncertain as to the degree of similarity required, but has concluded that substantial similarity was proven by the fact that both the voice exemplars and the wiretap tapes were recordings of phone conversations. The fact that different types of recording machines and tapes may have been used, or that the telephone conversations were taped at different distances from the telephones being used, is of no consequence in determining the admissibility of the voice exemplars.

11. WAS THERE A PROPER FOUNDATION FOR THE VOICE IDENTIFICATIONS OF THE DEFENDANTS?

The voices on the tape recorded phone conversations were identified by various witnesses as the voices of the Defendants. The witnesses testified that they were familiar with the particular voice which they were identifying because of face to face conversations with the Defendant. For example, Defendant Santai's voice was identified by F.B.I. Agent Fritz and Trooper Laganza. Agent Fritz testified that he overheard conversations between Santai and Defendant Whitaker in a restaurant and that he had a face to face conversation with Santai lasting for ½ hour to 45 minutes. Trooper Laganza testified that he had several direct conversations with Santai. None of the voice identification witnesses spoke with any of the Defendants over the telephone, nor had they heard taped conversations of the Defendants other than those presented at this trial. Defendants contend that the opinions of the witnesses regarding voice identification have insufficient bases.

Proposed Rule of Evidence 901(b)(5) submitted by the Supreme Court to Congress provides that a voice may be identified "whether heard first-hand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." On November 15, 1973, the House Committee on the Judiciary reported H.R. 5463 which amended the proposed rules, but rule 901(b)(5) was unchanged. The substance of this requirement was certainly satisfied by the voice identification witnesses in this case. One who first hears a person's voice over the telephone may later identify it as the one heard in a face to face conversation. United States v. Moia, 251 F.2d 255 (2d Cir. 1958). The *Moia* case is equally applicable to the case at bar which represents the reverse situation. Any difference between the circumstances surrounding the basis of the witness' familiarity with a person's voice and the transmission of the voice which the witness is asked to identify goes to the weight of the evidence, not its admissibility. See United States v. Miller, 316 F.2d 81 (6th Cir. 1963).

12. WAS THE GOVERNMENT'S CROSS–EXAMINATION OF THE OWNER OF THE FAMOUS RESTAURANT PREJUDICIAL TO THE DEFENDANTS?

Defendant Whitaker called as a witness the owner of the Famous Restaurant to rebut testimony by Agent Fritz that he overheard conversations between Whitaker and Santai at that restaurant. The testimony of the owner was limited to the frequency with which Whitaker normally came to the restaurant, and where he normally sat. On cross-examination, the Assistant U.S.

Attorney played a tape recording of a telephone conversation allegedly involving Defendant Whitaker and asked the owner whether he could identify the voice. The owner never made a positive identification, but in an equivocal manner stated that he could not be sure of the voice because he never spoke with Whitaker over the phone. Defendants contend that the cross-examination was beyond the scope of direct examination, and that the testimony was prejudicial to the other Defendants.

At the time of this trial, the Court generally followed the Proposed Rules of Evidence, Rule 611(b) of which provides that:

"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interests of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination."

H.R. 5463, *supra*, amends Rule 611(b) by providing:

"Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The Court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

Under either rule, the cross-examination of the witness was within the discretion of the court. The identification of Defendant Whitaker's voice was extremely relevant to this case, particularly since the Defendants vigorously attacked the foundation of the voice identification testimony given by Government witnesses. The restaurant owner was a witness unconnected with the prosecution who was familiar with Whitaker's voice.

In any event, the testimony elicited was not prejudicial to Defendant Whitaker, or the other Defendants, since no positive voice identification was made.

## 12. WERE DEFENDANTS ENTITLED TO A MISTRIAL WHEN TROOPER LAGANZA TESTIFIED THAT HE KNEW TWO OF THE DEFENDANTS IN HIS CAPACITY AS A POLICEMAN?

When Trooper Laganza was called as a Government witness to identify the voices of Defendants Santai and Pancerella, the following exchanges took place:

"Q: With respect to Mr. Santai, how do you know that that was Mr. Santai's voice on that conversation?

"A: I have known Mr. Santai for approximately twenty years, and in my capacity as a Pennsylvania State Policeman the past six years."

Transcript, Vol. VII, p. 155.

"Q: . . . Now how can you identify Mr. Pancerella's voice?

"A: I had occasion also to speak to Mr. Pancerella as a member of the Pennsylvania State Police."

Transcript, Vol. VII, p. 157.

Defendants' motions for mistrial were denied, but the Court immediately gave a cautionary instruction to the jury to the effect that no adverse inference may be drawn from Trooper Laganza's testimony because the fact that he knew Pancerella and Santai in his capacity as a policeman does not prove anything one way or the other. Transcript, Vol. VII, p. 164. This instruction was followed by laughter among the jurors, but just like Trooper Laganza's remarks, no conclusion can be drawn therefrom.

 Evidence of a defendant's prior criminal conduct, other than to impeach his credibility as a witness, is improper where it is not introduced to show a common scheme. United States v. Panepinto, 430 F.2d 613 (3d Cir. 1970). The testimony complained of here was not clear-cut evidence of prior criminal conduct on the part of the two Defendants. There are several imaginable instances where a policeman might know a person in his capacity as a policeman other than in connection with criminal activity. At most, the state-

ments of Trooper Laganza were inadvertently suggestive of past criminal conduct. The Court's cautionary instruction rendered any error harmless, and as such, the Trooper's remarks do not warrant a new trial. Cf. United States v. Panepinto, *supra*.

### 13. WERE COPIES OF TELEPHONE RECORDS INTRODUCED INTO EVIDENCE WITHOUT PROPER AUTHENTICATION?

The Government introduced into evidence the telephone bills for phones allegedly used by the Defendants in the conduct of the gambling business. The prosecution urged the jury to check the times of the various calls on the bills, and numbers called, and to compare this information with the times of particular recorded telephone calls played in court. Six telephone bills were identified by an agent in the Security Department of the Bell Telephone Company. In the normal course of the business of the Security Department, copies of particular bills were requested from the various local offices of the telephone company. These copies were marked with a special stamp identifying them as official documents, and they were regularly treated as true and correct copies by the Security Department. Copies of three other telephone company documents were identified by a service foreman for the telephone company office in Pottsville, Pennsylvania. These records indicate certain services performed on telephones allegedly used by some of the Defendants. The witness testified that the records were kept in the ordinary course of business by the telephone company. While the witness was not the sole custodian of the records, he did have access to them, and was specifically authorized by his supervisor to bring the records to court. The copies introduced into evidence were photostatic copies made by the witness from the original records of the telephone company which he brought to court.

 Business records are admissible into evidence under 28 U.S.C. § 1732 so long as they carry with them some guarantee of trustworthiness. United States v. Grow, 394 F.2d 182 (4th Cir. 1968). Records of the telephone company kept in the ordinary course of the company's business are entitled to the same evidentiary treatment as the records of other businesses. United States v. Mirenda, 443 F.2d 1351 (9th Cir. 1971), cert. denied, 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286; United States v. Covello, 410 F.2d 536 (2d Cir. 1968), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136. As to what constitutes proper authentication, the Proposed Federal Rules of Evidence, Rule 803(6), unchanged by the bill H.R. 5463 presently before the House, requires that the business record be authenticated "by testimony of the custodian or other qualified witness." Neither of the witnesses who identified and explained these telephone records was, strictly speaking, the custodian of the records. In a business the size of Bell Telephone Co., it might be a difficult matter to determine just who is the custodian. However, in my view, the explanations of the witnesses as to how and from where they acquired the documents were such sufficient guarantees of their trustworthiness as to warrant admission into evidence.

It should also be noted that if the admission of these records were error, such error was probably harmless. The recorded telephone conversations and voice identification of the Defendants represented the bulk of the evidence against Defendants. The telephone records merely confirmed the existence of the calls and that the times of the calls were correct as recorded in the logs of F.B.I. agents monitoring and recording the calls.

### 14. WAS THE GOVERNMENT'S EXPERT WITNESS ON GAMBLING OPERATIONS REQUIRED TO SHOW FAMILIARITY WITH THE AREA IN WHICH THE ALLEGED GAMBLING BUSINESS WAS CONDUCTED?

 Francis Cross, an employee of the F.B.I. who had been working in the

field of gambling analysis for thirteen years, was called as an expert witness by the Government to explain the gambling terms heard on the recorded telephone conversations and to determine the dollar amount of business being transacted. Defendants apparently do not object to Mr. Cross' qualifications generally, but to the Court's preclusion of Defendants' questions as to his familiarity with Mt. Carmel-Shenandoah area of Pennsylvania where this alleged gambling business was being carried on. In particular, Defendants contend that the expert witness' unfamiliarity with the economic structure of the area would render his assignment of dollar values inadmissible.

Mr. Cross testified that the gambling jargon used in the conversations played in court was typical of a straightforward betting activity, and but for one instance, the terms used were familiar to him. As to his analysis of the dollar amount of gambling being conducted, Mr. Cross almost always used the literal amounts of the numbers being discussed. For example, if a person said that a bet was six, the witnesses counted that as a six dollar bet, not $60.00 or $600.00. Under these circumstances, the expert witness' familiarity with the economic structure of the Mt. Carmel-Shenandoah area was irrelevant.

15. SHOULD THE DEFENDANTS HAVE BEEN GRANTED A MISTRIAL BECAUSE OF THE JUDGE'S REMARKS IN OPEN COURT RELATIVE TO THE LENGTH OF THE TRIAL IN RESPONSE TO DEFENSE COUNSEL'S REQUEST FOR CERTAIN JENCKS ACT MATERIAL?

■■■ The redirect examination of F.B.I. Agent Fritz revealed that up until about 1½ years before this trial, F.B.I. agents were required to file "daily reports," and that these written reports may still be kept in the Philadelphia offices of the F.B.I. Counsel for Defendants made a Jencks Act request for the production of any daily report records covering the five-year period during which Agent Fritz testified that he engaged in the surveillance of or overheard conversations with respect to some of the Defendants. The Court expressed concern over the length of time the trial was taking, and the delay that production of the daily reports would require. Defendants contend that such expressions were prejudicial to them in that it appeared that the Court was critical of defense counsel for making the request and was blaming them for the lengthy trial.

Although I was concerned about the length of this trial, my remarks were not critical of defense counsel. However, out of an abundance of caution and upon request of counsel, the Court instructed the jury as follows:

"Ladies and gentlemen, before we went to lunch, I remarked that I was concerned how long this case was taking, and I am concerned. But I would not want the jury to think that I was criticizing defense counsel for any delay. . . . And as you can see, we are not to the end of the case yet; but I wish to reiterate that defense counsel have an obligation to represent their clients to the best of their ability, and I was not criticizing them for delay. So you should not draw that inference."

Transcript, Vol. VII, p. 110–111.

Any prejudice to Defendants which may have resulted from the remarks of the Court should have been dissipated by this cautionary instruction.

16. SHOULD THE JURY VERDICT BE SET ASIDE ON THE BASIS OF REMARKS MADE BY ONE OF THE JURORS AFTER THE TRIAL?

■■■ Two days following the return of the verdict in this case, Defendants filed a motion to set aside the verdict because of certain post-trial remarks of one of the jurors. By affidavit, counsel for Defendant Santai stated that immediately following the termination of this case, one of the jurors approached him

and volunteered the following information:

"(a) That 'we all know' or 'we all knew' that the gambling activities of the Defendants in this case encompassed a period beyond the three days, December 16, 17, 18, for which they were charged in this case.

"(b) That he delivered coal in the Shenandoah-Mount Carmel area and was familiar with the area and felt he should have made this known to the Court, but chose to remain silent.

"(c) That he had had some contact with the Government relative to land acquisition and possibly should have made this known to the Court, but chose to remain silent."

On November 6, 1973, a hearing was held at which the juror was questioned by the Court concerning his post-trial statements. While the juror denied some of the statements attributed to him, the Court has no doubt that the content of the statements were as sworn to in the affidavit of the attorney and those statements are accepted as fact. Nevertheless, the statements taken together with certain explanations provided by the juror at the hearing do not warrant a setting aside of the verdict.

The statement that all the jurors knew that Defendants' gambling activities exceeded the three-day period alleged in the indictment was a fact reasonably inferable from the evidence which demonstrated a well-oiled gambling operation. Moreover, such a consideration was a part of the jury's decisional process and, as such, the Court is precluded from inquiring into it. Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245 (3d Cir. 1971).

Defendants contend that the other two statements made by the juror are facts he should have revealed on voir dire, and that had the facts been known, he probably would have been challenged. The Court has reviewed the questions asked of the jury on voir dire, and can find no indication that the juror lied. As to the statement that he delivered coal in the Mt. Carmel-Shenandoah area, the juror perhaps should have revealed that fact on giving his biography. Instead he stated that he was employed by another company. At the hearing it was learned that the juror picked up coal in the Mt. Carmel-Shenandoah area and delivered it in other areas, but that this was merely a part time occupation. The juror further testified that he knew only a few people from the area, and never heard anything about gambling or about these Defendants while he was there taking delivery of coal. Concerning the statements about land acquisition by the Government, it was learned at the hearing that the United States condemned some of the juror's land several years ago, and that a satisfactory settlement was reached with the Government. The only voir dire question which would arguably have required the juror to reveal this information asked whether

". . . you[,] have any dealings with the United States Government or any of its agencies or with any of the Defendants from which you might receive money?"

This question was directed towards dealings presently in progress and future receipt of money. The juror was justified in withholding information about the past condemnation proceedings when asked this question. Assuming for the purpose of argument that the juror should have revealed either or both of the facts in question, setting aside the verdict on that basis would still be unwarranted. The juror's testimony at the hearing satisfied this Court that the juror rendered his verdict without prejudice, and that the unrevealed facts in no way influenced his consideration of this case on the merits. See Turner v. United States, 135 U.S.App.D.C. 59, 416 F.2d 815 (1969); United States v. Woods, 364 F.2d 481 (3d Cir. 1966); United States v. Banmiller, 248 F.2d 303 (3d Cir. 1957).

For the reasons stated in the foregoing. opinion, Defendants' motion for judgment of acquittal on Count II will be granted, Defendants' motions for

## 170

judgment of acquittal on Count I and for a new trial will be denied, and Defendants' motion to set aside the jury verdict on Count I will be denied.

An appropriate order will be entered.